I please the court. Lee Phillips on behalf of plaintiff Dan Jackson. We are asking this court to reverse the decision of the agency hearing officer, which was affirmed by the district court for two primary reasons. Number one, the decision of the hearing officer failed to credit substantial evidence that my client, Dan Jackson, was in fact a resident of the December of 74. And that included his failure to consider the fact that the agency itself had made two prior determinations that Mr. Jackson's home site on the HPL did in fact exist. And in fact, the agency reversed denials of his sister's application and his brother's application in 1996 and certified them for benefits from the same home site that the hearing officer in this case found in 2015 not to have existed. The second issue that we think requires reversal is that the hearing officer in this case made his decision based on adverse credibility findings of my client, Dan Jackson, his sister, Helen Williams, who was certified earlier after her denial was his aunt, Peggy Nelson, who also applied for and was found credible and certified for benefits all from the same family in the same area. The hearing officer was the home site for the family friend, Peggy. Was that the same home site or Peggy Nelson? Was that the same home site or a home site in the same area? It was his aunt, Peggy Nelson. It was a home site in the same area on the Hopi partition lands, but it was a separate home site. Okay, thank you. And so the only findings that the hearing officer made were that Peggy Nelson, the aunt who had applied, found to be credible and certified, and his sister, Helen Williams, who applied initially denied, but then that was reversed when the agency itself at her hearing in 1996 found her testimony to be credible, her brother's testimony to be credible, and there was a field investigation report which the attorney for the agency found to be credible and as a result reversed the initial denial for both Dan's sister and her brother. The hearing officer in this case, though, simply made a conclusory statement that he found Helen Williams, the sister who had been certified and found credible previously in 1996, he found that her testimony was questionable and doubtful and Peggy Nelson, the aunt who had applied, found credible and certified from a separate home site, same family, he found again using the exact same language, he simply substituted the names. He had exactly the same finding that Helen Williams and Peggy Nelson, their testimony was questionable and doubtful and he just simply found that Mr. Jackson's testimony without any explanation was not credible. No specific finding. Mr. Phillips? Yes, Judge. So let's say we agree with you that the Homestead issue is, you know, that the agency didn't do a good job on the Homestead issue. How do we get over the residence question where the agency did have, you know, multiple pieces of objective evidence to support the decision that it made? How do we get over that on a substantial evidence standard? Your Honor, the substantial evidence as to residency, again, of course, the standard is, did Mr. Jackson demonstrate an intent to return or to reside on his reservation home site? And if he had that intent, did he manifest or demonstrate it in a meaningful way? And in this situation, we have a man who worked for the federal government with Bureau of Indian Affairs for 20 years. He was assigned to multiple duty stations in Arizona and New Mexico. Each time he completed his duty assignment and returned to his home site on the reservation. And in fact, the big concern the hearing officer found was there was a period of time in 1971 through 75 where Mr. Jackson resided in New Mexico in Albuquerque. He initially was working for the BIA in Chinle on the Navajo reservation. Then he went to Gallup, New Mexico for another duty assignment and was there for approximately a year and a half. And then when he and his wife at that time were deciding to have a family and she became pregnant, they moved to Albuquerque because his wife was from Albuquerque and they were able to reside with her family in Albuquerque. Mr. Jackson returned to the reservation and now took a position in Fort Defiance on the Navajo reservation, bringing his two children from Albuquerque. The only reason that he was in Albuquerque, though, was because of the birth of their children and the fact that they had a place to stay where they didn't need to either buy or rent. So they resided with her family until the divorce ended the relationship. Mr. Jackson returned to Fort Defiance and completed his service to BIA both in Fort Defiance and Ganado, each time returning to his home site on the joint use area. And ultimately, when he retired, he returned and continues to reside there at the home site that is now about five miles from the original home site because the family was required to move from Hopi partition lands. They crossed the fence five miles and they had a second home site on the Navajo partition lands, which is where they continue to reside to this day. So he manifested. We have to look at this. I mean, I understand the longer story, but we have to look at this at a particular point in time. And that's December of 1974. Where is he residing at that time? And at that time, the objective evidence is he works in New Mexico. He lives in New Mexico. His family's in New Mexico. His bank accounts are in New Mexico. His car and license and all of that stuff are connected to New Mexico and not to Arizona. So how is that not substantial evidence to support what the agency decided? Well, if you look at all of the evidence, his entire history, each time he was assigned to a particular duty station, he spent a certain period of time there. In Gallup, he was in New Mexico initially. And like Arizona, when you move to New Mexico, within a short period of time, you have to register your vehicle there. You have to acquire a New Mexico driver's license. And when you're working during the weekdays, at least, and being paid by the VIA in Gallup, New Mexico, it's not uncommon. In fact, I would say it's normal that you would have a bank account there. The same is true when he was transferred to Albuquerque. His residency was Albuquerque for the work week, but it was still, and he returned. And the testimony is uncontroverted by all witnesses that he returned on a regular basis, maintained his residency on the HPL, had livestock, helped take care of that home site. And the testimony, there was no testimony to the contrary, that he regularly returned, even after he was divorced and continued to live in New Mexico. As soon as he was able to transfer back to Arizona, Fort Defiance, he registered his vehicle in Fort Defiance in Arizona, driver's license, Arizona, bank account, Arizona, Fort Defiance, and Window Rock. Okay, Mr. Phillips, can I interrupt? Yes, sir. As I understand the he and his wife separated before they were divorced, and that after the separation, he testifies that he goes back to the home site on weekends, before the 1974 date. Am I wrong in understanding that's what he testified to? You're not wrong, your honor. He was in Albuquerque from approximately 71 until 75. They separated in 1973. He continued to work, but he had no residence. He didn't rent a house. He didn't buy a house. He continued to go home on the weekends to help take care of his elderly parents. So his testimony is that after the separation, he is spending, he is regularly spending weekends back at the home site. Every weekend. Yes, he said he went back on Thursdays and returned to Albuquerque on Monday mornings. Yes, and as I read the decision of the hearing officer, he didn't hold that this was insufficient. He held that he didn't believe Mr. Jackson. He entered adverse credibility findings as to all three witnesses. That's correct, your honor. But he provided not a single cogent or specific explanation for those findings. In the same way he found that the home site didn't exist, he didn't explain how that could be true when the agency had already determined on two occasions that the home site did exist. He never addressed those things at all. He never addressed the field investigation report that was done in 1986 by the agency itself that confirmed the home site existed. He didn't address, and we presented all of this, it's all in the record. He didn't address the 1996 home field visit where they actually went out and took pictures of the home site's existence. And the hearing officer still found it didn't exist and my client wasn't credible in claiming that he did reside there or that there was a home site, despite the agency's own findings in two separate occasions earlier. This was never addressed. He never addressed any of the evidence that we presented as to the home site or as to Mr. Jackson's time in Albuquerque or time in back on the reservation, other than the uncontroverted testimony of Dan Jackson, his sister Helen, who was certified ultimately, and Peggy Nelson. They all testified. And Mr. Shelton, who was the only office agency's representative, he confirmed in his testimony in our hearing in 2015, that yes, in fact, they had gone out and reversed their decision as to Helen Williams and as to Thomas Jackson, my client's brother, based on the findings and the testimony of Helen Williams, the same witness. They reversed the findings and they based it on the 1996 field investigation report, which confirmed that Dan Jackson, his mother, and the other children that were living at the home site did reside there in 1974. And the hearing officer's decision is completely silent as to that evidence and those issues. Didn't the hearing officer say that even if he believed Mr. Jackson's testimony about going back on the weekends to visit family, that it still wouldn't be enough? Yes, he did. And he based that on the fact that he registered his car in New Mexico, had a New Mexico driver's license in New Mexico. But again, anyone who's ever moved to another state knows that that is required by the state law to have a license and register your vehicle in that state. And if you're going to live there and work there, it's not unreasonable to think that you're going to need someplace to cash your paychecks and have a bank account. All of those things then changed back to Arizona as soon as he returned in 1975. Right, but that's not 1975. Why don't we hear from the other side, and you've saved about three minutes. Sorry, Your Honor? Why don't we let's hear from the other side, and you have saved about three minutes. Yes, sir. Thank you. You're muted. Push the button. You're muted. Got it. My apologies. Good morning. May it please the court. My name is Tecla Hanson-Young, and I represent the Office of Navajo and Hopi Indian Relocation. The question here, is not whether Mr. Jackson could have proven in the first instance that he lived on Hopi partitioned lands. The question is whether O'Neill's finding that he was a legal resident of New Mexico in December 1974 is supported by substantial evidence, and it is. Well, can you be a legal resident of a state for purposes of the laws of that state and for the purposes of the relocation statute? I'm sorry, Your Honor. It suddenly got very quiet. Could you repeat your question? Yeah. The residency has various definitions, and it may very well be that he was a resident of New Mexico for certain purposes, certainly for paying taxes, for purposes of having to have a driver's license, probably also for purposes of federal diversity jurisdiction. Is that inconsistent with his also being a resident of the home site for purposes of the relocation statute? Well, the standard for determining residency under the relocation standard is that of legal residency, and you can only have one legal resident. You're not answering my question. Are you saying as a categorical matter that if someone is a citizen of a state for purposes of the laws of that state, the person may not also at the same time be a resident of the home site? We haven't briefed that question, Your Honor, but I'm not sure that the court needs to decide that specific issue here because I think what the court should do is look to the relocation regulations themselves, which requires legal residence, and then the preamble to the regulations defines what legal residence is, and so that's the You were arguing that he was a state resident of New Mexico and therefore he could not be a resident for purposes of the relocation statute. Yes, that is correct. Well, I think what we're arguing is not whether he was a state resident of New Mexico or not. We're arguing that under the under the relocation regulations, he was a legal resident of New Mexico within the meaning of the Let's see. He's living in New Mexico. He works in New Mexico, and now I'm going to make the evidence cleaner than it is, but every weekend for 10 years, he goes back to the home site, works the home site, stays with his family members there. Is he not a resident of the home site for purposes of the regulation? I think it would depend on other facts and specifically where he intended to reside, combined with the manifestations of that intent, which is what is listed in the preamble to the regulations, which is on page 42A, page 42 of our appendix. As I read the cited cases here, it's very common for both Navajo and Hopi in order to earn a living that they work somewhere else, yet they work in the home site for purposes of residency, isn't that right? Yes, that's certainly true. And for example, there could be residents who intend to reside on Hopi partition lands but are temporarily away from the home site for work or economic purposes or school. But the fact is here, they still have to intend to live on Hopi partition lands and manifest that intent. And what we have from Mr. Jackson is his stated intent to move to Albuquerque to live near his wife's family. Now that's neither for economic nor educational reasons, which are the two reasons that are listed or frequently given for residents being temporarily away from partition lands. He intended to live in New Mexico. But the timeline we have is once he and his wife separate, he then goes back on weekends to the home site. So he's no longer, he's tied to New Mexico by his job. But every weekend when he's not tied to New Mexico for the job, he testifies that he's spending time at the home site and that he intends to have that be his residency. Now, the hearing officer didn't believe him. But that was his testimony. That's correct. But he also was tied to New Mexico. It's consistent with the fact that he intended to live in Mexico to be near his family. The fact that his children were there is consistent with both Ms. Williams' testimony that he moved to keep his family together. And it's also consistent with the fact that he ultimately obtained custody of his children in 1976 and moved them with him to Ganado and Fort Defiance back in Arizona. So it is correct that he testified that he visited his mother's home site as frequently as he could and every weekend after 1973. But he could still visit socially and intend to live in New Mexico. And that's what the hearing officer found on page 272 of the excerpts of record and 270. I mean, the hearing officer specifically said his return visits to his mother, however frequently, while applicant was living and working in Albuquerque were insufficient to constitute substantial contacts with a resident that was partitioned to the tribe of which he is not a member. So the hearing officer found even if he visited his mother's home, it wasn't his home. And the reason for that is because of all of the objective documentary evidence showing that he intended to live in New Mexico. Now, the example that Mr. Phillips points to that he was required to obtain a driver's license and car registration in New Mexico. Because if he didn't intend on living there, it's not clear why he would have transferred his driver's license to that location. And there have certainly been other examples. If he's spending substantial time in New Mexico, New Mexico law is that he's got to have a driver's license in New Mexico. He would be violating New Mexico law if he didn't have a driver's license in New Mexico, given the circumstances. Assuming that's true, you still have situations where people move, for example, for college and they don't change their vehicle registration. They leave it at their parents' house. And we also have examples in O'Neill's previous. That's in fact illegal. We don't do it, but it's illegal. Well, we also have examples in O'Neill's prior decisions where, and this is not something that O'Neill considered, but because these decisions weren't given to O'Neill at the time of the hearing. But we have an instance, an applicant, applicant Bolsio, which is in the supplemental excerpt of record where she divorced her husband or separated from her husband and then actually changed her driver's license and her vehicle registration back to her mother's home site. And that was sufficient, the hearing officer found there, to demonstrate her intent to move back to the home site. Here, when Mr. Jackson separated from his wife and said he had nowhere to stay, he didn't transfer his vehicle or his driver's license back to Arizona or back to his mother's purported home site. He could have done so if he was not, in fact, living anywhere in New Mexico at that stage. And I think even setting aside- And I suspect he would have run a very serious risk under New Mexico law of deregistering his vehicle because he was there five days a week working there with that vehicle. That may be true, but we still have Mr. Jackson's testimony that he intended to move to Albuquerque to live near his wife's family, which is consistent with Navajo culture. And then we have his testimony that he stayed there. You moved there initially. Sure, but there's no testimony that he then intended to change his residence back to his mother's home site. And also there is a requirement that the applicant needed to have lived on the home site for a year before December 22nd, 1974. So he would have had to move back, been separated, and there's no evidence of testimony on this in the record, but he would have had to have moved back to his mother's home site a full year, changed his legal residency back to his mother's home site a full year before the December 1974 date in order to be eligible for benefits. But again, he didn't even testify that he intended to move back. In fact, his testimony, which is on page 176 of the excerpts of record, is that he stayed in Albuquerque after he separated from his wife. And he, in fact, stayed there from 1973 to 1976 until he obtained custody of his children and then moved with his children back to the Navajo reservation for defiance, and he obtained employment in Ganado. And there's no evidence in the record that when he transferred his employment, so he worked in Hopi Partition Lands and then continuously transferred, he worked in Chile in the mid-60s, and then he continued to transfer his employment farther and farther from Hopi Partition Lands to Gallup and then to ultimately to Albuquerque in 1969, which is the farthest away. And again, that was to live near his wife's family. So for these reasons, that's more than sufficient evidence for a reasonable fact finder to determine that it supports the conclusion that his legal residence was in New Mexico. He intended to live there and manifested his intent through the objective documentary evidence and his actions, staying there and maintaining his employment there This is not relevant legally, but I'm curious, how much money is at stake here? You know, Your Honor, I actually, I don't know that the answer to that question. If you would like to know, I'm happy to check with the agency afterwards and submit a letter. I think it's legally irrelevant. Yeah, I did have that thought this morning that I should, it would be interesting to know, but I actually didn't find out. But, you know, I think that the important things for this court to look at when reviewing the agency's decision, again, are not what Mr. Jackson could have proven in the first instance or not what the court would do if it was sitting in the initial fact-finding capacity, but whether there was substantial evidence for O'Neill, the hearing officer, to find that Mr. Jackson intended to live in New Mexico. And given all of the documentary evidence, the car, registration, his driver's license, the fact that he banked there, the fact that he could, he himself testified that he stayed there after his wife and him separated in 1973 and kept his employment there until 1976. And then his initial intent on moving there, which was to be closer to his wife's family. It wasn't that he didn't have adequate economic opportunities closer to Hopi partition lands. All of those things are more than enough to support O'Neill's finding that he lived in New Mexico, legally resided in New Mexico. Okay. On the question, which you've so far not addressed, and I think I understand why, but I want to nail it down. On the question of the existence of the home site, are you arguing that there's substantial evidence to support the hearing officer's decision that the home site didn't exist? We are arguing that. I would just like to start out by saying that even if the court finds that there wasn't substantial evidence to support the agency's finding here, or is troubled by the agency's finding, given the fact that Ms. Williams was certified, the court should still affirm on the basis. I understand that, but you're continuing to argue that there's substantial evidence to support the decision that the home site did not exist. We do, and let me explain why. I think it's important to note in the first instance that Ms. Williams obtained benefits on the basis of the agency's attorney's certification. It wasn't on the basis of any findings made by the hearing officer. So no hearing officer has in fact made any factual findings concerning Ms. Williams' home site or legal residency. So that's important because... Wait a minute. What do we do with the survey where I think it's Betty So goes out and actually inspects the place and says, yes, there was a home site here? Sure. The survey was conducted in 1992, and the problem with the survey is that it doesn't actually show when the structures were built and when they were occupied. It just simply shows that there were remains of structures. And we do have another document in the record at ER50, which in fact says that Ms. Williams... It was an interview of Ms. Williams' mother, and in fact, it was a field investigation conducted by O'Neill Certification Department. And what they found in speaking with Ms. Williams' mother is that they did in fact have a home site on Hopi partition lands in the 1960s, but that was dismantled before 1974. So it could be that... But to talk with the mother, we have testimony or evidence that she didn't speak English, and that the people who came out there were a Hopi and an English speaker. So I have trouble understanding how she could have said this. So the 1982 interview states that they spoke with Ms. Williams' mother, not Mr. Jackson's mother, and suggests that they spoke with other people in the area. But as to your specific question about the language barrier, the enumeration roster, the joint use area roster, which is on ER99, lists both Mr. Jackson's mother and Ms. Williams' mother as being found on Navajo partition lands. So it's not as if the enumerators found either Mr. Jackson's or Ms. Williams' mothers on Hopi partition land, or that they didn't find them. They actually found them on Navajo partition lands. And the enumeration list also shows that Mr. Jackson's mother listed his two sisters as residing with him. So there's at least some indication that she understood enough to list the two sisters. Somehow his two sisters were on the enumeration, whereas Mr. Jackson wasn't. So it's, you know, given these circumstances and the fact that Ms. Williams had to repeatedly look at her notes, couldn't remember different years, and in fact said she couldn't keep all the years together. And the fact that the testimony concerning the home site indicated that it was an extremely large home site that was actively used year-round near two roads that both Mr. Jackson and Ms. Williams testified they drove their cars on to get to the home site. It was within a couple miles of a windmill, which was connected by a road, whether it was a dirt road or a wagon trail, it was still accessible by motor vehicles. There were several hundred head of cattle. There were two hogans, a house, a corral, an arbor, a cornfield that was the size of a barn. All of that testimony concerning the huge scope of the home site led the hearing officer to find that if this home site existed, it would have been found by the enumerators because the way that the enumerators found home sites in the first instance was by looking at aerial photos, looking for evidence of structures, and that many structures would have appeared, even under the rubric advanced by the Nez deposition, where she did testify that they looked at aerial photos and then they went out, they interviewed neighbors to find out where other people were living, and also affirmed by the mediators report, which found that the enumeration process was generally thorough. So on that basis, it was reasonable for the hearing officer in this instance to find that the home site didn't exist. But again, the court doesn't need to reach that issue in order to affirm. Mr. Phillips, you've saved some time. Yes, Your Honor. Thank you. First, as to the issue of Helen Williams. Could you speak more loudly? Partly, I can't turn up the volume on mine, and apparently you can't turn up the volume on yours, but I'm having trouble hearing you. Yes. Again, I just want to clarify for the record that there were two field investigations done. One was done in 1982. That's the one where the investigator from the agency went out and spoke to Helen Williams' mother Louise. Helen Williams' mother Louise said her family previously had a Dan Jackson's mother. His mother, Bernice Charlie, has a total separate family history. They had the same father, Helen and Dan, different mothers. So where Helen's mother's family came from is entirely different than from where the Charlie's family came from. But Helen testified, as did her brother Thomas, that they all lived together, the two mothers and the father with children in the one home site. And it was not as if this was a metropolis bursting with people. This was a remote area that had what was described by all the witnesses as wagon trails leading out of the home site, no roads, wagon trail that they themselves built to the windmill. There wasn't cars there until later when Dan Jackson and his sister were old enough to have jobs and be traveling out of state. The issue, though, I guess most importantly, is the intent of Dan Jackson. And what he demonstrated time and time again is when he left, he left always for employment. Under the government's argument, then no one could ever qualify for relocation benefits if they were forced to take a job out of Arizona. And we know that there are multiple decisions from the courts. Badoni, Mike, they're all cited in our papers where people lived in California and other states for years as long as they maintained their residence and returned and demonstrated their intent. In Badoni, he returned multiple times, but he did not demonstrate an intent to return and reside there because he bought a house in California. Mr. Jackson never rented a house, never bought a house. He continued to return. He commuted. When he worked in Chinle, he commuted an hour and a half from the home site. He commuted when he worked in Fort Defiance. He commuted from when he came back to Arizona and worked in Ganado. And when he retired, he returned to the home site again to live. And that's where he is today. So his intent has been manifested over and over and over again. So I would submit that the government's supposition about why he stayed in Albuquerque longer than he might have needed to because his children and his wife were there and his job was until he got the job in 1976 in Fort Defiance. Again, I'm not sure it's legally determined or even how relevant it might be. You just said he lives there today. He lives on the home site today. Well, again, the original home site on the HPL was destroyed when the family had to move to the Navajo side, the NPL, about five miles across the line. And that's where he's living. He's living on the Navajo side, not on the original home site. He's living in there. They had a seasonal camp on the Hopi side and the Navajo side. And that family now lives on the Navajo side because they were required to move there. But I just wanted to pick up when you said he's living there today. I want to make sure I knew what you were talking about. I'm sorry, I wasn't clear about that, Judge. If you don't have any other questions, I have no further things at this point to offer. Okay. Thank both sides for very good arguments. It's an interesting case. I know there were a lot of these cases some time ago. This is the first one I've ever seen. Thank both sides for good arguments. The case of Jackson, let me get this right, versus Office of Navajo and Hopi Indian Relocation is now submitted for decision. Thank you very much, counsel. Thank you very much.
judges: Schroeder, W. Fletcher, Hunsaker